Judge Cars:
In these cases, two questions have been raised and discussed, with great ability and research; 1st. Was William Woodford interested, when he was called to give evidence? 2dly. If not interested, was he incompetent, as being an endorser of the promissory note, which is the foundation of the action. This last point brings, for the first time, before this Court, the celebrated rule established by the case of Walton v. Shelley, and exploded by that of Jordaine v. Lashbrook; a question which, whether we consider the great names it has divided, or its extensive *318 influence on the interests of the community, is of the first magnitude. I shall therefore give it the first place in my examination of the cause.
The case of Walton v. Shelley, 1 Term. Rep. 296, was decided by the Court of King’s Bench, in 1786. It was debt on a bond. Pleas, non est factum and the statute of usury. On the trial, the defendant proved, that the bond was executed in consideration of two promissory notes, endorsed by one Sedley and others; which notes were given up to the defendant, on the execution of the bond. The defendant then called Sedley to prove, that the notes were given for an usurious consideration. It was objected, 1st, that he was interested; 2dly, that independently of the question of interest, he was incompetent, because he was called to invalidate the security which he had himself given. The Court were of opinion, that he was not interested, or rather,-that he came to give evidence against his interest; for while the bond existed, he could never be liable as endorser of the notes; but by destroying the bond, that- claim might be revived. “But,” said Lord Mansfield, “what strikes me, is the rule of law, founded on public policy, which I take to be this, that no party, who has signed a paper or deed, shall ever be permitted to give testimony to invalidate that instrument, which he hath so signed. And there is a sound reason for it; because every man, who is a party to an instrument, gives a credit to it. It is of consequence to mankind, that no person should hang out false colours, to deceive them, by first affixing his signature to a paper, and afterwards giving testimony to invalidate it.” He adds, “the civil law says nemo allegans suam turpitudinem est audiendus.” The other Judges agreed with Lord Mansfield. It will be seen, from this statement, that the decision was not confined to negotiable paper; but assumed the broad and unqualified ground, that no party, who had signed any paper or deed, should be received as a witness to invalidate it. And so far as the rule is to derive authority from Lord Mansfield, (cla *319 rum ct vencrabile nomen,) it must certainly be taken in its full extent.
the In the year 1789, came on the case of Bent v. Baker, 3 Term. Rep. 27. ,/lssumpsit against one of the underwriters ou a policy of assurance. The question was, whether another underwriter of the same policy, could be a witness to prove circumstances tending to shew that the underwriters ought not to pay the loss. The counsel opposed to the admission of the witness, pressed the authority of Walton v. Shelley. Lord Kenyon (who was now Chief Justice, Lord Mansfield having closed his long and high career,) remarks, “ It has been said, that a person cannot he permitted to give evidence to invalidate an in strument, which he himself has executed; bsu J vím sent to that as a general proposition; for Eri of a trial at the bar of this Court, whore witnesses to Mr. Jolliffe’s will, were evidence of the insanity of the testat|r,.^t^the_time Of making it. Now, in that case, they ea instrument they had attested; and though’Ifeej^jtesti, was ultimately discredited, yet no doubt was eftiertained respecting their competency.” The reporter makes Lord Kenyon add, “that he agreed with his brother Buller, that where a person has signed a negotiable instrument, he shall not be permitted to invalidate it by his testimony.” I3ut this remark Lord Kenyon expressly denies, in Jordaine v. Lashbrook, that he ever made. Mr. Buller certainly observed iu Bent v. Baker, that the rule must be confined to negotiable instruments; and from this time, it was considered as thus confined. In this state, it maintained a fluctuating and precarious existence; sometimes acknowledged, sometimes denied by the Judges at Nisi Brins; till the year 1798, when the ease of Jordaine v. Lashbrook, 7 Term. Rep. 601, brought the question again before the King’s Bench; and the rule of Walton v. Shelley, was uprooted from the foundation, and has never since been acknowledged as law, in any of the English Courts. *320 Jordaine v. Lashbrook, has restored .the ancient rule; and j(- js now settled law there, that the endorser of negotiable paper, may be received to invalidate it. See Jones v. Brook, 4 Taunt. 464; Howards. Braithwaite, 1 Ves. & Beam. 202; Chitty on Bills, and the late writers on evidence.
How the rule has been settled in our sister States, I have not been able fully to ascertain, not having the books to refer to. So far as I have had it in my power to examine, they differ on the subject. Massachusetts and Pennsylvania, adopted the rule of Walton v. Shelley, (as restricted by Bent v. Baker,) before that rule was changed by the English Courts, and they are understood still to adhere to it. New York, with both the cases before it, adopted Walton v. Shelley, confined to negotiable paper. But the first case on the subject, Winston v. Saidler, 3 Johns. Cas. 185, was decided by a divided Court, three to two, and Kent and Radclif, were the dissentients. South Carolina, it is also said, has adopted Walton v. Shelley; Connecticut and Tennessee, Jordaine v. Lashbrook. These are all the States, of whose decision on the subject I am informed. I have thought this brief history of the rule, not improper, as it is now, for the first time, brought before this Court for a solemn decision.
Let us first consider the rule as laid down in Walton v. Shelley) secondly, as qualified by Bent v. Baker.
It is a general and long established principle, that every person is a competent witness, who is capable of being sworn, has not been convicted of an infamous crime, and is not interested in the cause. The old cases upon the competency of witnesses, have gone upon very subtle grounds; but of late years, the Courts have endeavoured, as far as possible, consistently with those authorities, to let the objection go to the credit, rather than the competency, of the witness; and the question now is reduced to this, “is the witness to gain or lose by the event of the cause?” Was the excluded witness in Walton, v. Shelley, either inte *321 rested or infamous? As to interest, it was acknowledged on all hands, that it formed no objection; he was called to testify against ]i¿s interest. Was he infamous'.1 All the writers on the subject, and the adjudged cases, shew, that to exclude a witness on this ground, there must be a conviction and judgment against him, for-some infamous crime, as treason, some species of the crimen falsi, &c.; and the record of the conviction and judgment must be produced on the trial. The admission of the witness himself, of his being then in prison, under judgment for felony, or of his having been guilty of perjury on another occasion, will not aflect his competency, however it may go to his credit. Rex v. Castel Carinion, 8 East. 78; Rex v. Teal, 11 East. 809; Phill. Evid. 24, 5, 6, and the eases there cited. In Walton v. Shelley, there was no conviction, no crime infamous in the legal sense, imputed even. The witness was excluded, because ('say the Court,) “no man shall bo permitted to invalidate, by his testimony, an instrument to which he has put his name. It is hanging out false colours to deceive mankind. It is alledging his own turpitude, which no witness shall be heard to do.” Now, I say, that a man may be received to invalidate an instrument he has put his name to: that a witness may be heard, though alledging his own turpitude.
As to the first; every day’s practice shews, that instrumentary witnesses may be heard to impeach the instrument they have attested. Lord Kenyon, in Bent v. Baker, mentions the case of Mr. Jolliffe’s will. It is reported under the name of Loza v. Jolliffe, In 1 Black. Rep. 365. In Tille v. Grevet, 2 Ld. Raym. 1008, Lord Holt, held that a man, who had conveyed land, might be a witness to prove that be had no title; thus impeaching his own solemn act and deed. The maxim, nemo allegans suam turpiiudinem est andiendus, (said to he taken from the civil law, hut which seems to have eluded the research of those who have sought it there) cannot possibly be understood te apply to the exclusion of witnessesj such a construction *322 would destroy a main pillar in the fabric of the law of evidence. It has been the practice of all time to admit ac« complices; and yet they come to acknowledge themselves guilty of crimes of the deepest dye. If it be said, that this must be so, or the criminal code could not be executed, I admit the fact; but I say, if the lives of our citizens depend on such evidence, on what ground shall we reject it, where property alone is at stake ? Are dollars and cents, or the interests of commerce, dearer than life, and more carefully to be guarded? Or does not the same policy of the law, which not onl ¶ permits, but invites, the part iceps criminis, to bring the hidden deeds of darkness to light, equally require the detection of the usurer, the gambler, the secret contriver of plots, conspiracies and frauds ? None but the associates, the instruments, or the victims of these beasts of prey, visit their dens, or mingle in their transactions. If we say that these shall be excluded as witnesses; if we shut out this source of light; we cover with the mantle of darkness and impunity, all these foul deeds. In Cowp. 197, we find the case of Clark v. Shee. It was an action on the case, for money had and received. Plea, the general issue. The facts were these. One Wood, being the clerk of the plaintiff, a brewer, and receiving money from the plaintiff’s customers, and also negotiable notes for the plaintiff’s use, in the ordinary course of business, paid several sums with this money "and notes, to the defendants, on the chances of the coming up of the tickets, in the state lottery, contrary to the lottery act of 1772. The plaintiff and the sureties of Wood, released him; and the plaintiff called him, to prove the money received by the defendant. Mr. Butter, (then at the bar) objected to his competency. lie said, “ Wood is a particeps criminis, and therefore clearly incompetent; for no man shall be admitted to prove his own turpitude, as perjury or the like.” Lord Mansfield, after stating the case, said, “As to the first point, there can be no doubt, that Wood was an admissible witness. In Bush v. Rawlins, in debt upon the statute of Geo. 2, ch. 24-, *323 against bribery, a man who had taken the bribery oath, was held a competent witness to prove that he himself had been bribed.” Here we find the same great Judge, who was the father of Walton v. Shelley, pronouncing it a case too clear for doubt, that a clerk who had broken the law, and embezzled his master’s money, might be received to alledge his own turpitude; and founding himself on a case, where one who had taken the oath against bribery, was admitted to prove that he himself had been bribed; thus a/legans suam turpitudinem, doubly; perjury and bribery combined. In all these cases, the circumstances under which the witness is introduced, must of necessity affect his credit; sometimes in a greater, sometimes in a less, degree, according to the colour of his guilt. We can easily conceive cases, in which the evidence of the witness ought to have, scarcely the weight of a feather in the scale; and others, where the moral obliquity would he so slight, as hardly to detract a feather from its weight. Now, as a general rule must exclude or admit the whole class, it has been thought best, for the investigation of truth, the protection of morals, the suppression of vice, and the execution of the laws, to suffer them all to go before the jury; who being, by our law, the uncontrollable judges of the weight of evidence, must be presumed as capable of deciding on the credit, as the Court are on the competency of a witness. It appears to me, therefore, that the rule which Walton v. Shelley, attempted to establish, was an innovation upon the clear and settled law of evidence; such as Judges, who are the ministers of the law merely, have no right to make.
Let us now consider the rule, as restrained by Bent v. Baker, to negotiable paper. Between the original parties to negotiable paper, the consideration may be enquired into; but it is á rule of the law merchant, growing out of the interests of commerce and convenience of trade, that against the innocent holder, no defence can be made, arising from the nature of the original transaction; except *324 where a statute has declared certain acts and things illegal, alKj that all contracts, securities, &c. founded on them, shall be void: as for instance, our statutes against usury anc* gaming> and possibly there may be others. In these cases, the original taint adheres to the paper, in whosesoever hands it may come. It is void, and the defence may be set up, as well against the innocent holder, as the usurer or gambler himself. The British statutes, and our own, are alike as to this. See Boyer v. Bampton, 2 Str. 1155; Low v. Waller, Doug. 735. So far as the commercial rule holds, it applies to the nature of the defence, not to the character of the witness. No evidence, however unexceptionable the witness, can be received. But the rule has its exceptions, usury, gaming, &c. Here the defence may be set up; it follows the paper. The defendant (it is agreed on all hands) may prove the usury or gaming, by any witness, whose name is not on the paper; and this seems to me decisive, at once, of the whole question; for if he is not estopped from setting up the defence, how can we restrain him, as to the evidence, within limits narrower than those of the law? How can we say, that he shall be deprived of the testimony of a witness, neither infamous, nor interested in making a defence, which the law not only tolerates, but of which it is the parent, which it has created, by declaring the paper void? Does it not, by this deck-ration, disrobe it of its commercial character? Can we say this is a negotiable note, entitled to all the privileges of such paper; and that, therefore, the endorser, though swearing against his interest, and though admissible in all other cases, shall not be heard to prove it usurious, when the statute has authorised the maker to plead and prove the usury? Suppose I were to lose to B. $200 at unlawful gaming. I execute to him my bond, signed, sealed and delivered, for $100. He assigns it to C. I make a negotiable note to him, for the other $100. He endorses it to D. I am sued on the bond and note. I plead to each the statute of gaming. On the trial, I call B. the assignor *325 and endorser, to sustain my plea. He does not object to giving evidence; but it is objected by the assignee and endorsee, that he is incompetent. Would it not be strange, that the objection, though over-ruled at once as to the bond, should be sustained as to the note; when the statute has declared both void? Such a construction, it seems to me, would open a door, by which gamblers and usurers might easily escape detection, and defeat the law. They would have to take negotiable notes and bills of exchange, for their unlawful winnings and loans, and get those, who arc witnesses to the transaction, to put their names upon the paper. This could be easily arranged. I think, therefore, that the rule, as qualified by Bent v. Baker, is just as untenable as that laid down in Walton v. Shelley. It has been said, that the decision in Jordaine v. Lashbrook, Was greatly influenced by a consideration of its effect on the revenue laws. But any one who reads the case, will see, that the Judges founded themselves on general reasoning; and their arguments carry the strongest conviction to my understanding. It is remarkable, that Kenyon, Grose, and Lawrence, declare explicitly, that there was no case in the books to support Walton v. Shelley; and that Jlshhurst, who adhered to his former opinion, did not produce a single authority to sustain it. He rested solely on Walton v. Shelley, the imposing name of Lord Mansfield, and the mischiefs of a contrary decision, to the interests of commerce. But these arguments did not avail; and it seems to me strange, if such a rule be necessary for the protection of negotiable paper, that England, the most commercial nation in the world, should have been so late in resorting to it; and should, after so short a trial, have abolished it altogether.
It was said, in the argument, that the decision in Jordaine v. Lashbrook, had probably given rise to the statute of 58 Geo. 3, ch. 93, which provides, that no bill of exchange or promissory note, though given for an usurious consideration, shall be void in the hands of an endorsee- for *326 value, unless at the time of his discounting or paying the consideration of the same, he had actual notice of the usury. But in Chapman v. Black, 2 Barn. & Ald. 589, the Court assign to it a different origin. They say it was probably passed, in consequence of the decision of Laws v. Mazerado, 1 Starkie, 385; a case decided in 1816, not touching at all the question of the competency of a party to negotiable paper, to impeach it, by his-evidence; but deciding merely that the bona fide holder of a bill of exchange cannot recover upon it, against the acceptor, where the payee had endorsed it, upon an usurious contract, made at the time of the endorsement.
It may be observed upon this law, that it does not interfere, in the slightest degree, with the decision of Jordaine v. Lashbrook. So far as it protects the endorsee, it is by taking away the defence; but if he is an endorsee with notice, the act does not protect him, and both the usury and the notice may be proved upon him, by one whose name is on the paper. If the Legislature had supposed, that the mischief they were about to remedy, resulted from Jordaine v. Lashbrook, they would have changed the law of evidence, which that case established on its ancient foundation, instead of restraining the operation of the statute of usury; and they would have done this, as soon as the mischief was discovered; whereas, the statute did not pass, till twenty years after the decision of Jordaine v. Lashbrook.
Another remark suggested by this law is, that in England, it seems to be thought, that when any favoured class of cases is to be shielded from the operation of a law, this must be effected by the law making power, and not, that it is the province of the Courts, for the purpose of reaching the object, to assume the Legislative function, of changing the settled law of evidence.
Upon the best view, therefore, that I have been able to take of the subject, I conclude, that the being an endorser of the note, did not render W. Woodford, incompetent.
*327 As to the other point, whether W. Woodford was interested in this» cause; it will be discussed at large by some of the Judges who follow me. I shall hot attempt to anticipate what they will express so much better; but will content myself with saying, that I concur with them in the following positions: that our statute giving a joint action in this case (though on separate contracts) subjects the parties to all the consequences, flowing from the settled rules of the common law, governing joint actions: that of these consequences, one is, that the plaintiff must recover against all or none; another, that he has a right to a joint judgment against all for his debt, and all his costs: that of this joint judgment, W. Woodford had no l'ight to deprive him, by having his cognovit actionem entered finally, against the plaintiff’s will, while the cause was depending on the pleas of the other defendants: that the act, making a confession of judgment equal to a release of errors, did not change the case as to the rights of the plaintiff, or the propriety of the entry: that the cognovit tendered, could only be received and entered by the Court, as an interlocutory judgment, dependent on the final judgment to be rendered in the caso; and, consequently, that W. Woodford was interested in that judgment, and could not he admitted as a witness.
Judge Cl he .ex :
The question whether Woodford was a competent witness for the other defendants, to any purpose, depends upon the construction of the statute, under which these actions are brought, and the act declaring, that a judgment on eoufession shall be equal to a release of errors.
As to the first of these statutes; it authorises any one entitled to demand any sum of money, upon a protested hill of exchange, to commence and prosecute an action of debt, for principal, interest, damages and charges of protest against drawers and endorsers jointly; or either of them *328 separately; a provision afterwards extended to negotiable notes. The remedy given by this statute, was perfectly novel in all respects; since it authorised a joint action, upon several contracts; and such an action of debt, even against one only, as was not known to the common law. Upon the construction of this statute, the first question is, whether, if the plaintiff elects to sue the drawer and endorsers jointly, he must sue all, or whether he may sue a part of them only; as, in case of a bill of exchange, the endorsers without the drawer, or the drawer and second endorser, without the first endorser. I put the examples in this way, because, as the statute only gives a new remedy, without affecting or varying the character of the security as commercial paper, or the substantial rights and responsibilities of the parties (as was decided in Slacum v. Bomeroy, 6 Cranch, 225) it probably would not be doubted, that the holder, although the bill came to him after many endorsements, might strike out as many of the endorsements as he pleased, and claim as the immediate endorsee of the first or any subsequent endorser, at his pleasure; and sue the drawer and the first endorser, and as many of the other endorsers, as ho pleased, in a joint action, striking out such of the names (standing after the names of those of the endorsers, who are sued) as he did not choose to make defendants to the suit. So, if one of the endorsers had taken lip the bill, he might sue the drawer and the endorsers, who stood before him, jointly. But it seems to me, that if more than one are sued, both the drawer and first endorser, must be defendants; for without the drawer, the action would not be commenced according to the terms of the act; and without the first endorser (if a subsequent endorser was a defendant,) the action would not be either joint against the drawer and endorsers, nor against any one of them separately; and the name of the first endorser cannot be struck out, without destroying the plaintiff’s title. T.he statute has, in terms, given the same remedy in this case, as if all the parties to the bill, drawers and endorsers, *329 had executed their joint and several bond to the plaintiff; the known rule of law, in which case, is, that the parties are only bound according to their contract; and that all, or only one, must be sued, and no intermediate number can. This being the settled law, as to the effect of a joint and several contract, it is fair to presume that the Legislature meant, that the same terms used in the statute, should have the same effect. If the provision of the statute had been, that the holder might sue the drawer and endorsers jai n tly, and had not provided for suing them separately, it could hardly be contended, that an action of debt under the statute, could be brought against one only; and it was to avoid this consequence, that the act provided, explicitly, for a separate action of debt against either. If the act were construed to authorise a separate action, by virtue of the authority to prosecute & joint action, this last provision would have been wholly superfluous. A construction which would have authorised a suit against two out of three, would have authorised a suit against one of two, whether drawer or endorser.
Again. The statute authorises any one having a demand for any sum of money, &£c. to sue the drawer and endorsers jointly, or either of them separately. This must mean, having a right to demand against all those who are sued; for the statute could not have intended to authorise a suit against one or more, against whom the plaintiff had no right to demand any thing; especially as those discharged could not recover their costs; as will be more particularly adverted to hereafter. If, therefore, one of the defendants, in such an action, is discharged by the act of the plaintiff, as by discontinuing the action against him; or shews by the pleadings or proofs, that he is entitled to be discharged; it shews that the plaintiff had not, as the statute requires, a right to demand a sum of money against, all the defendants, which is a pre-requisite to his right to prosecute the action under the statute; and he can have no judgment against the other defendants. The plain *330 tiff must not only have a demand for a sum of money, aga£nst all who are sued, but for the same sum. This may be thought to be an extremely strict and litei’al construction of the statute; and so it is. But it is necessary, in order to avoid the extremely inconvenient and mischievous consequences of a more liberal construction, which should consider a suit, under this statute, against several, as a joint and several suit, so as to enable the plaintiff to discontinue as to one, and take judgment against the others; or to take several judgments against the several defendants, for different sums. If the acceptor make a partial payment to the holder, it enures to the benefit of the drawer and all the endorsers; and all remain liable to the holder’s demand for the balance, and for no more. So, if the drawer make a partial payment to the holder, it enures to the benefit of the acceptor, as against the holder; because the acceptance of a bill does not, as between the drawer and acceptor, extinguish the original consideration, upon which the bill was accepted, unless the money be paid; or if a partial payment be made by the acceptor, it operates as a partial discharge only of the original consideration; and if the drawer pay the whole amount of the bill, or a part, he may sue the acceptor, upon the original consideration, for so much as he has paid. And therefore it is, that where a partial payment has been made to the holder, by the drawer of a bill, such payment avails the acceptor; since the party making such payment, may recover upon the original consideration, against the acceptor, as well as he could upon the bill,' and suffers no loss, in consequence of the acceptor’s having a credit for payments made, by him. This rule is necessary to prevent the mischief of the holder’s recovering the whole of the acceptor, and holding so much as he has received from the drawer, as a trustee for him, in cases where the bill may have been accepted for the accommodation of the drawer. But where the payee, or any subsequent endorsee of a bill, makes a partial payment to the holder, it does not discharge, pro tanto, any person *331 liable before him; but the holder can, and ought, if he sues him, to recover from the person or persons liable before the person who has made such payment, the whole amount of the bill, unpaid by the defendant, and hold so much as he has received of any of the subsequent endorsers, as a trustee for him, or those who have made such partial payment. The reason of this is, that the acceptor is bound to all the parties, except the drawer, only by virtue of the bill, upon the law of merchants; and he cannot be responsible to various actions on one contract. As to him, the. legal title to the note or bill is in the holder only; so that, if the holder did not recover from the acceptor all that was due from him, without regard to any payments made by the parties, other than the drawer, either the acceptor would be liable to as many actions upon a single contract, as the several parties have made several payments (which cannot bo admitted;) or those making the payments, would have no remedy at all against any of the parties, except his immediate endorser, for the consideration paid to him» So, in an action by the holder against any other of the parties, he may recover all that has not been paid by the defendant, or by ,some one liable before him.
Suppose, then, that in an action under the statute, by the holder against the drawer of a bill of exchange, and several endorsers, it should appear that all the parties, except the drawer or acceptor, had made partial payments to the holder. What judgment could be recovered ? Not a judgment against all the defendants, for the whole amount of the bill; for, although upon the .principles above stated, if the drawer had been sued alone, and had paid nothing, judgment might be rendered against him for the whole amount of the bill or note, notwithstanding a part may have been paid to the holder by the other endorsers, and the holder be a trustee for those who had paid, to the amount of their payments; yet, nothing could justify a judgment against the other defendants who had paid, for more than they owed, after having credit for the payments made by *332 them. Could a judgment be rendered against each, for the balances remaining unpaid by them respectively, as if separate suits had been prosecuted against them? I think not; because the statute, in terms, contemplates only a single sum of money to be due from all the defendants, to the plaintiff. It would produce a necessity, sometimes, of entering, in the same cause, as many several judgments, as there were defendants, and one more for costs; and great difficulty in executing them, contrary to all the principles and analogies of the common law. The consequences of such an innovation can hardly be foreseen. For the same reasons that judgments might be rendered severally, they might be rendered successively ; and after giving judgment against one, it might appear, in the same record, that another had paid the whole debt; and all thereby entitled to a discharge. I do not think that such an effect ought to be given to the statute; unless such appeared, manifestly, to be the intention of the Legislature. It seems to me, that the statute intended to give the joint action, and to leave all'the consequences of such action, to be governed by the principles of the common law.
Could a judgment, in such case, be entered against all the defendants, for the sum found due to the plaintiff, after crediting all which had been paid to him, by all the parties to the bill ? If it could, the consequence would be, that the last endorser, when there were more than one, having paid a part of the debt, could not recover what had been paid, against the drawer; for, as between such last endorser, and the drawer, there is no privity of contract, upon which to found any action at the common law. The former could not sue the latter, upon the bill, upon the custom of merchants, because there being already a judgment on the bill against the drawer, no new action could be maintained against him, upon it, by any one. The last endorser would thus lose all remedy for what he had paid, against all the other parties to the bill, except against his immediate endorser; a remedy which he would have had, through the *333 holder of the bill, as his trustee, if the parties had sued severally. Ought this right, against the remote parties to the bill, to be lost by giving a new remedy to the holder? It may be said, that the statute contemplates a recovery for the sum due to the plaintiff; the balance, after crediting all payments made by any of the parties, and for which all are responsible; that the right of an endorser, through the holder as his trustee, against the remote parties to the bill, is not founded upon inflexible principles of law, but upon a practice of convenience, which the statute over-rules. I have great doubts, whether, in such case, the judgment should be for all the defendants. The plaintiff should have judgment against all for the balance due him, after crediting all payments. It is not necessary to decide that question, in this case; since, whether the proof of payments by any one, which the others had not a right, in several actions, to avail themselves of, should discharge all, or authorise a judgment against all, only for the balance due to the plaintiff, the question of Woodford’s competency would be affected precisely in the same way.
A judgment for all the defendants, upon the ground that one had shewn that he was entitled to be discharged, would not prejudice the rights of the plaintiff against the other defendants, in new and separate suits against them. For it would generally appear, upon the record, that one was discharged upon the merits, of which he might avail himself in bar of another action; and that the others were discharged, because the plaintiff had not made out a case which authorised his suit under the statute; of which they could not avail themselves in another suit by the plaintiff against them. If in any case, such fact existed, and did not appear upon the record, it might be averred and proved in a subsequent suit.
But it is insisted that this joint action upon several contracts, authorised by statute, does not come within the reason of the rules of the common law, as to joint actions upon an entire and joint contract; and that there are even cases, *334 in actions upon a joint contract, in which a judgment may j3e given for one, and against another defendant; as in the case of the bankruptcy or infancy of one of the defendants. In these cases, the one is discharged without affecting the liability of the other, because he pleads a matter which goes to his personal discharge, without shewing that the contract never existed as charged in the declaration, or bad, in any way, been barred or satisfied; and the ground of the discharge of the one, must appear upon the record, or one cannot be discharged without the other. As, if an .infant were to give his infancy in evidence upon the píe a of non assumpsit, and the issue were found for him; judgment must be given for both defendants, unless it appeared somehow upon the record, that he was discharged upon the ground of infancy. So if the contract declared on, appeared to be void ab initio, and. not merely voidable at the election of the infant, no judgment could be had against the adult; for this would falsify the declaration. The very ancient case in Viner, of a suit upon a bond against two, and the plea of non est factum found for one, and a judg-. ment for him and against the other, is referred to. I should doubt whether this case would now be considered as law; since the finding of the issue of non est factum as to one, would completely disprove the contract stated in the declaration; and to this effect was the decision of the Chief Justice, in the case of Dandridge and his sureties, cited at the bar. The cases too, of actions of tort, are referred to, in which the plaintiff may succeed against some, and fail against others; and even, as it is said in some very ancient cases, have several judgments, in one action, against several defendants, for several trespasses. I should doubt too, whether the proposition laid down, in these last mentioned cases, is now law. It seems that only one judgment can be had, in one action of tort, against all the defendants who are responsible, and for the same damages and costs. If there be two defendants found guilty of several trespasses, I should think that such a finding ought to abate *335 the suit; but it seems, the plaintiff may cure the error of suing two, in one action for several trespasses, by a nolle prosequi as to one, and taking judgment against the other. 1 Chitty’s Plead. 74. The plaintiff may discontinue as to one, and have judgment against the others; or one may be found not guilty, and judgment be had against the others; because a tort is in its nature the separate act of each individual; and the plaintiff had originally a right to sue all, or any one, or any number, at his pleasure. But even in these cases, if one pleads a plea, which shews that the plaintiff has no right of action against any, and it is found for him, it destroys the plaintiff’s action against all. The case of two executors sued for a debt of the testator, and one charged because he has assets, and the other discharged, because" he has none, is like the case of infancy and bankruptcy. It is a personal discharge; not on the ground that the plaintiff’s right of action never existed, as charged in his declaration, or had been in any way barred or satisfied-The declaration, in such cases, contains no allegation in .respect to assets, in the hands of the executors.
In the case at bar, the discharge of one defendant docs not go, necessarily, in all cases, to the discharge of the others from liability in some form of action. But this case is distinguishable from all others which have been mentioned, in this; that the remedy is purely statutory: that the statute requires, in order to enable the plaintiff to sue the drawer and endorsers jointly, that he should have a demand against all for the same sum of money; and if, for any cause, he cannot sustain his demand against any one, it shews that such a case does not exist, as the statute requires, to justify such an action. It is like the case of a party failing to prove the contract, as laid in his declaration.
If Woodford, therefore, had stood upon his plea, and not confessed the action, he would not have been a competent witness, to any purpose, for the other defendants; since he would have had a direct interest in the event of *336 the issues as to them, whether his evidence went to dis-their responsibility. them altogethex-, or only to diminish the amount of
What effect had Woodford's confession of the plaintiff’s action, upon the question of his competency to give testimony for the other defendants? The plaintiff refused to accept this confession, and to take judgment thereon. It is, not necessary to enquire, whether a proper and unimpeachable judgment might have been entered on this confession, separately, against Woodford, if the plaintiff had desired it. One case has passed this Court, in which such a separate judgment has been allowed, upon the agreement of the plaintiff and one defendant, and the cause proceeded in against the other defendant; but the cause was not considered upon the point now under consideration. Even in those cases in which one of the parties may be discharged, and not the other, as in the case of bankruptcy, the Court will not discharge the bankrupt, before the verdict as to the other party, for the purpose of enabling him to give evidence for the other party; and in the cases of trespass, it is discretionary in the Court, to discharge one, to enable him to give evidence for another defendant. That is only done, where the plaintiff appears to have joined him wantonly in the suit, for the purpose of excluding his evidence. In actions of tort, one of the defendants could not, at common law, make himself a competent witness, by confessing the action for the whole amount of the damages claimed in the declaration. The plaintiff could not be bound to accept a judgment, according to the confession; for he would thereby lose his subsequent costs, as against that defendant, and would, indeed, at common law, be precluded from further proceeding against the others. And if judgment were not entered on such confession, final judgment, notwithstanding the confession, could only be given against the party confessing, for the damages found against the others; for he could not bind them by his confession, and only one entire joint judgment could be given. But the *337 plaintiff hero had a right to refuse an immediate final judgment, on Woodford’s confession; for he was entitled to a joint judgment for all his costs, expended in the prosecution of his action against all the defendants. This is the effect of our general law of costs; and even in cases in which one of the defendants may be acquitted, and a judgment against the others may be had, the plaintiff is entitled to all his costs against all the defendants, who are found liable to his action, however those costs may have been expended; and the acquitted defendants are not entitled to recover their costs, except in the cases provided for in the statute; those of Trespass, Assault and Battery, False Imprisonment and Ejectment. In all other cases, such as Case, Trover and Replevin, the acquitted defendants are not entitled to costs; and this has been the construction of the English statutes, from which ours are copied. If, in the cases under consideration, one of the defendants might be discharged, and the others held bound, he who was acquitted could not recover his costs. The Court ought, therefore, upon Woodford’s confessing the action, to have entered the confession and continued the cause, as to him, until the case was ready for a final judgment as to all; and then entered a joint judgment for debt and costs, against !Voodford. and the others. This is the course at the common law. The statute was made for the benefit of the plaintiff, and cannot be used to his prejudice, without his consent. At common law, the plaintiff could not, if he would, take a final judgment against one of several defendants, confessing the action. Such confession was not a release of errors, and was subject to the final event of the cause, as to the other parties; and if they shewed that the plaintiff had no right of action against any of the defendants, even in actions of tort, the party confessing was entitled to avail himself of their defence, and to have a judgment, with the other defendants, against the plaintiff. The Court could not, properly, enter a final judgment against *338 Woodford, upon his confession, without the assent of the plaintiff, until after the issues were tried as to the other defendants, and the cause was ripe foi’ one entire and final judgment as to all the defendants. If an interlocutory judgment only, had been entered on the confession, what ought the Court to have done, if it had been found after his confession, that the other defendants were not liable to the plaintiff’s demand, because the contract never existed, or was not obligatory upon them; or because one of them, had paid the debt, or was not liable to the whole demand, because he had paid it in part? At the common law, there would have been no difficulty. The judgment, in such case, must have been either foi Woodford, with the other defendants, or against him for the same sum, that they were responsible for. At common law, a confession of the action was only a warrant to the Court, to enter a judgment, unless it afterwards appeared upon the record, that the party was entitled to be discharged.
Our statute makes no provision which can enable us to determine, in what cases it is proper to enter a fitial judgment, upon a confession, at the time when it is made, or an interlocutory judgment, subject to the future event of the cause, as to other parties. That is left precisely as at the common law. Taking the terms of the statute literally, it would seem that if one of the defendants, in an action against several, confessed the action, and judgment was thereupon given against him, and it afterwards appeai’ed, in the same cause, that the other defendants had previously performed the contract, or satisfied the plaintiff’s demand, (so as, at common law, to entitle the defendant confessing to a judgment, notwithstanding his confession,) the error of such judgment (for which it would be reversed at common law) would be cured by the statute, declaring that “ a judgment on confession shall be equal to a release of eri’ors.” Yet if, in the same case, the Coui’t, instead of entexing a final judgment upon such confession, had entered, (as was proper according to the principles of the common law,) an inter *339 locutory judgment, subject to the event of the cause as to the other parties, and if it had afterwards appeared in the record, that the other defendants had performed the contract, or satisfied the demand, or were released, or otherwise entitled to bo discharged, upon a ground which went to the whole action, and the Court had therefore given judgment, as well for the defendant confessing, as for the others, (as ought to be done, according to the common law,) such a judgment would bo irreversible; as there would be no judgment upon the confession, to operate as a release of eriors. Thus, upon the literal construction of the statute, it would depend upon the will of the Court, under the very same circumstances, whether the judgment shall be for plaintiff or defendant; and the judgment would be irreversible, whether given for the one or the other. Such a consequence could hardly have been contemplated, or intended by the Legislature. It could only have intended that a judgment, property rendered upon confession, should liave the effect of a release of errors. By “properly rendered,” I mean, where nothing appears in the record, subsequent to the confession, which, upon the principles of the common law, would make it improper to give final judgment upon the confession. Notwithstanding the literal terms of the statute, it seems to me, that it is the confession, and not the judgment, which, in effect, operates as a release of errors. The Legislature intended to bind the party by his own act, and not by the act of the Court, except so far as it was warranted by the act of the party. The confession of the party is a waiver of all errors in form or substance, in the record and proceedings, up to the time of confession; but not of any error subsequently arising. If an actual release were executed, of all errors at any given stage of the cause, it would not sanction any errors after-wards committed; and if a final judgment can properly be entered, upon the confession, at the time it is made, then such judgment cannot be reversed, since all preceding errors are released by the confession, and none can afterwards *340 occur. There are many analogous cases, in which the act 0f j-]le party is a waiver, and equal to a release of errors, up to the time of doing the act, but not of errors subsequently occurring; as an appearance and pleading waives all errors in the process. It follows, that if either of the other defendants had been discharged from the plaintiff’s demand, in whole or in part, Woodford, (the plaintiff having refused to take final judgment on the confession, at the time it'was made,) would have been entitled to avail himself thereof, and to be discharged also in whole or in part, notwithstanding his previous confession of the plaintiff’s action; unless he had chosen to renew his confession, after the trial as to the others; in which case, a valid and unimpeachable judgment might have been rendered against him. The consequence is, that Woodford was not a competent witness for the other parties, to any purpose.
The cases relied upon by the appellant’s counsel, in which several judgments may be had, against several defendants, (as in criminal prosecutions and ejectment) have no application to the case under consideration; in which one party cannot be liable without the others, and all must be liable to the same extent. The act of 1819, authorising a confession of judgment in the clerk’s office, by any one in custody, for the purpose of enabling him to avail himself of the law for the relief of insolvent debtors, was not in force until after the judgments in these cases were rendered; and whatever may be the construction of that section, it cannot affect the event of these cases.
The question, whether a party to a negotiable instrument is a competent witness, to impeach its validity, does not affect the result of these cases. Yet, as it is understood that they were brought up upon that point, and many cases are suspended in the inferior Courts, waiting the expected decision of this point, it is thought advisable now to determine that question.
This subject has been so fully discussed in Westminster Hall, and our sister States, and has been argued so tho *341 roughly in this case, that it might he sufficient to say, that I assent to the authority of Jordaine v. Lashbrook, and the opinions which have followed that case, referring to the reasons upon which that case was decided, in opposition to Walton v. Shelley. It may, however, not be amiss to state, in a summary way, some of the reasons which lead me to this conclusion.
The common law method of investigating facts, led to the distinction between the competency and credit of witnesses; the first, a question for the Court, the last, for the jury, and with us, emphatically and exclusively for the jury. The question of competency was, in its nature, a question of credit. The only ground upon which a person, sensible of the obligation of an oath, could be declared incompetent, was, that he was wholly unworthy of credit. If his credit were impeached by any circumstance, but not necessarily and wholly destroyed, he was competent; and the degree of credit to he given to him, was to be determined by the jury; otherwise, the Court must have taken upon itself tire province of the jury. Accordingly, from the earliest times, it was settled that only two circumstances necessarily and utterly destroyed the credit of a witness; interest in the event of the cause, and conviction for an infamous crime. In all other cases, the jury were to judge whether any, or if any, what degree of credit should be given to a witness, according to the circumstances which might go to affect his credit. Upon the subject of interest, there have been fluctuating decisions, as to what sort or degree of interest would disqualify a witness; but it is now settled, that it must be a certain interest in the event of the cause, to be affected by the verdict being given in evidence for or against the witness. But the rule as to exclusion for infamy never (until the case of Walton v. Shelley,) varied or was doubted. It was confined to cases of conviction for an infamous crime. Before that case, a witness was not rendered incompetent, in any case, civil or criminal, by giving evidence of his own fraud, embez *342 zlement, perjury, or felony; and even if it appeared that jie ]la(j received a bribe to give his evidence, he was not thereby rendered incompetent. Young v. Slaughterford, 11 Mod. 228, pl. 2. All these matters were left to the jury, as affecting the credit only of the witness.
Walton v. Shelley, laid down a new rule; that no person, who had signed a paper or deed, shall ever be permitted to give testimony to invalidate the instrument; upon the principle that no person, alledging his own turpitude, ought to be believed. The broad proposition, laid down in this case, was almost immediately abandoned, as a general rule, and was confined, in its application, to negotiable instruments. The admission, that the rule was not universal in its application, was, in effect, an admission that it had no just application in any case, independent of considerations of convenient policy; and, upon general principles, the only ground upon which such evidence could be withheld from the jury, was that a party, who had passed a title either to negotiable paper or any thing else, to a bona fide purchaser, with an assurance of the validity of the title, admitted himself guilty of a fraud, when he offered himself as a witness to invalidate the title; and that this admission so totally destroyed his credit, as that he ought not, under any circumstances, to be believed, and therefore should not be heard. If, upon general principles, this were true as to commercial paper, it would be true in all other cases. It is contrary to the moral sense of mankind, and all experience, to say, that the endorser of a negotiable note, coming to invalidate it, is guilty of a greater degree of moral turpitude, than he who commits a felony or embezzles the property of another clandestinely, and proves the fact, to enable the owner to recover it, or has been guilty of a fraud, as to which he testifies, 2 Vin. 637, Philips v. Wilcox; or of perjury, in relation to the very matter of which he gives evidence; or has received a bribe for giving testimony; or has sold property, knowing it not to be his. Nor could any one, bound to *343 judge of the credit of such witnesses, say that the endorser would be entitled to less credit, than any of those above mentioned. Yet under the modified rule in Walton v. Shelley, all these would be competent witnesses, and their evidence left to be weighed by the jury. The peculiar character of commercial paper, (which produces the consequence that some other than the person dealing immediately with the drawer or endorser, may suffer by the fraud of passing a void note, as valid) does not aggravate the moral turpitude of the act. The turpitude is precisely the same, whether the immediate party to the contract, or a remote endorsee, is defrauded. Land sold by one knowing he has no title, may pass through as many hands as a negotiable note; and so may property embezzled.
But if such a fraud by an endorser, ought so completely to destroy his credit, as to make him an incompetent witness, I should have thought that before he was declared to be incompetent, it should have been ascertained that he charged himself with the fraud. Now, in very many cases, an endorser may prove the instrument to be void, without subjecting himself to the charge of the least impro-, priety, much less of a damning fraud. Suppose otie contracts a debt for usury or gaming, and gives his note to the usurer or gambler, endorsed by a friend as a surety, anti the note still to remain in the hands of the usurer or gambler; could it be said, that the endorser, in giving evidence of these facts, was allegans .mam turpitudinem? If so, the gambler or usurer would recover the debt, not because any fraud was practised on him, but because the endorser had put it in his power to practise a fraud on some other, but which was never perpetrated. So, if the endorser gave noiice to the endorsee, of the nature of the consideration, yet even in these cases, as soon as it was announced that the endorser was introduced to prove the note void, he would be rejected under this modified rule of Walton v. Shelley; as coming to alledge his own turpitude.
*344 Is it thought that there is greater danger of perjury in these cases, than others? And why? The party has no interest; but in some cases, is swearing against his inter* es^' it suspected that he will swear falsely, to discharge the defendant, that he may, in turn, swear falsely, to discharge him? So in all possible cases, witnesses may be bribed, or influenced by corrupt motives. There is no more danger of corruption in these than in all other cases, depending on parol proofs, where the chance of escaping detection is equal. It is manifest that the rule in question, as to negotiable securities, was not founded on general principles of law, but solely upon the policy of supporting the credit of commercial paper, even in cases in which the policy of the statutes condemns it. The Judges thought that it was unjust that the innocent holder of such an instrument should, in any case, be injured by the vice of the original consideration. The Legislature thought otherwise, and declared it void, in the hands of such holder. The Judges could not repeal the laws; but they attempted to evade their effect, by suppressing the only evidence, which, in general, exists, which could be used to carry the laws into effect; for such transactions, especially usurious, are generally secret, and known only to the persons concerned I think the Courts exceeded the bounds of their legitimate authority, when they set up and enforced their policy against the policy of the statutes.
The ambiguous latin phrase, whether taken from the civil or the common law, (to which the rule of Walton v. Shelley, is referred) whilst it gave some countenance to, was certainly not the foundation of, the rule. The maxim, though unlimited in its operation, was applied to the single case of negotiable paper; in that case, even where no turpitude can be pretended to exist. The meaning of the maxim is, that a man alledging his own turpitude impairs his own credit, more or less according to the degree and nature of the turpitude; and in this sense it is universally true, as a sensible rule for testing the degree of credit to *345 winch a witness is entitled; but has no application to the question of competency or incompeteucy. And so it is considered by Lord Coke, who uses the same expression, in relation to a witness who contradicts himself; which certainly does not render him incompetent. Before giving so much importance to this maxim, it would have been well to have recollected another maxim of the civil law. '-‘Non ex regula, jus sumatur, sed ex jure, quod est, regula fiat.”
It is said that the inconveniences produced by the decision in Jordaine v. Lashbrook, over-ruling Walton v. Shelley, has given occasion to the act of 58 George 3. This act does not interfere with the doctrines of the law of evidence. It takes away the defence on the ground of usury, in all cases of negotiable securities, in the hands of a bona fide holder, without notice, whether that defence rests upon the evidence of a party to the security, or any other evidence. It leaves the party to the security, to give evidence of the usury, in cases in which such evidence can be received from any other witness. It leaves securities for gaming considerations, on the same footing as before. The Legislature did not disturb, or intend to disturb, the rules of evidence, in any degree. The statute only shews, that the commercial policy of Great Britain, is more favorable to some negotiable securities, than it formerly was.
In most of the States of the Union, in which this question has occurred, the rule in Walton v. Shelley, limited to negotiable paper, and in one, in its original extent, has been adopted. But this was at a time, in most cases, when the principles of this decision had not been questioned arid discussed, as they have since been; and the precedent, once established, has been adhered to. This case was probably followed in the first instance, without much consideration; and the question might, have received a different decision, if it was now, for the first time, to be decided in those *346 States as it is here. I observe that the Court of Appeals, in Claiborne v. Parish, 2 Wash. 146, (which occurred a few years after Walton v. Shelley, and three years before Jordaine v. Lashbrook,) seemed disposed' to adopt the maxim of “ nemo allegans, fyc.” in its fullest extent, and apply it to a chain carrier, who had committed a fraud in carrying the chain. But, this case went off on the point, that the evidence of what the chain carrier had said, not on oath, was inadmissible; and the question was merely alluded to, certainly not solemnly adjudged.
Upon this point, I am of opinion, that a party to a negotiable instrument is a competent witness to invalidate it, if he be not incompetent for some other cause, than that he is a party.
Judge Coaeter.:
It does not appear in the bill of exceptions, for what purpose the witness was introduced; but it is said to be important that we should decide, whether,' as a general proposition, he was competent to prove the invalidity of the notes in. their inception; and this point has been very ably discussed at the bar, on both sides.
It has been said also, that if he was not competent to that purpose, he might have been examined as to other points, and that a total rejection was improper.
It is certainly true, that a witness may give evidence to particular facts, when, as to others, he cannot be interrogated. That would have been the ease 'in Bent v. Baker, 3 Term Rep. 36, as stated in Justice Butter’s opinion, had the witness been considered incompetent as to every thing else, except to prove what took place when he acted as the agent of the parties; and many other cases of a like kind, may well be supposed.
Although I am of opinion, for reasons hereafter to be given, that in this joint action, he could not be examined
*347 to any point, I am, nevertheless, willing to consider the first question above propounded, as a general one, uninfluenced by the nature of this joint action under our act of Assembly.
To establish his incompetence to prove any thing going to invalidate the notes in their inception, the decisions in Walton v. Shelley, Bent v. Baker, and the decisions in New-York and other large commercial States of the Union, have been cited. On the other side, the case of Jordaine v. Lashbrook, and the uniform decisions of the British Courts since, have been relied on.
The expediency that the law of evidence on this point, (it being one peculiarly interesting to the commercial world,) should, if possible, be uniform in the United States, has been insisted on with much force and earnestness, and, I confess, has had its full weight with me; insomuch, that I have struggled not a little to support the decisions in our sister States.
We must look, however, to the general and approved common law rules on the subject of evidence; for by these, in this as in all other cases, we must be governed, as the law of the land.
The general rule is, that any one may be examined as a witness, unless he is excluded for want of integrity or discretion. Gilb. Law of Evid. 119-30. Those who are excluded for want of integrity, are, first, persons interested. There is no just cause to believe such persons, and therefore, the law removes them from giving testimony; second, such as are stigmatised by a conviction for offences which blemish the moral character, as for treason, or any species of the crimen falsi, as for forgery, perjury, &c.; and it is the nature of the offence, not the kind of punishment, which woiks this incapacity.
Now, had it been made, by law, an indictable offence, and the party rendered infamous for endorsing and putting into circulation a negotiable paper, knowing it to be bad in *348 its origin, on conviction of this, he would have been ren¿ere(;j incompetent, not only as to the note so put into circulation, but I apprehend also, in any other case whatever; a"d in such case, I supposed it possible, that a confession of this turpitude, necessarily constituting a part of his evidence, might be tantamount to a conviction, and that, in that event, he might be excluded. I was inclined also to think, that though no statute had so declared it, yet since the extension of commerce, and viewing the importance of supporting these papers as a circulating medium, and that the ancient rules of evidence have, in some measure, been relaxed from their primitive strictness, if such a degree of moral turpitude attached to the transaction as amounted to the crimen falsi, in foro conscientise, and that was necessarily confessed by the witness, the maxim relied on in Walton v. Shelley, might apply. But I can find no case to support me in these views; whilst many seem to be against-me. The ease of Clark v. Shee, Cowp. 197, and the case therein cited by Lord Mansfield, of Bush v. Rawlins, seem to be of this character.
The incapacity of a witness who is stigmatised, proceeds from the conviction, in consequence of which he will not be a witness in any case. But here he would be excluded, and that on the score of turpitude in the particular case only.
In many cases, a witness may be guilty of an offence which would subject him to an infamous punishment, and even establish on him the crimen falsi, but which must be prosecuted within a given time, after which he cannot be convicted. Shall his confession, then, of such an of-fence, go further'to exclude him, than his admission that he had been guilty of perjury7 in another case ? But this has been decided only to go to his credit. 1 Phil. Evid. 26. Besides, he could never be restored to his competence in the particular case, though a party convicted may be restored by suffering punishment, in certain cases, or by-pardon.
*349 For these reasons, I think he cannot be excluded, under that rule of the law of evidence, which excludes a witness because he is stigmatised. Indeed, no case puts it on this ground. He is not considered as generally incompetent, but only in the particular case, like a witness who, in a particular case, is interested.
It seems to me, that he more properly comes under that class of cases, where a witness may be denominated an accomplice or particeps crimmis. Eat in these cases, he is competent before conviction, as well against, as for a partner in guilt, where there are different indictments, or he is not a co-defendant in the suit. 1 Phil. Evid. 33-4; Glib. Evid. 118; Bull. N. P. 285-6.
To exclude him on the ground that he cannot be received to invalidate any paper whatever, to which his name has given credit, and which seems to be the broad proposition in Wallon v. Shelley, has been necessarily abandoned in the case of Beni v. Baker. No general rule of evidence then, excludes him on that score; and though the mischief is greater as to negotiable paper, yet. I can see nothing that will justify us in making those cases an exception, or rather in introducing a new rule of evidence, unknown to the common law, in relation to such paper. It appears to me, that it must be left to go to his credit, and will more or less avail, in that way, according to the circumstances of each case. At one time, I was much disposed to think, that in almost every case of this kind, the witness must stand in so suspicious a point of view, as that his giving evidence can hardly be accounted for, except on the score of corruption, or some engagement mutually to testify for each other; and as therefore very little credit ought, in general, to be given to such witness; it would be better, at once, to shut the door to temptations to perjury and combination, by declaring such witness incompetent. Such witness gives evidence against his own apparent interest, and consequently could not be compelled to testify. Ilis evidence then, being voluntary, and in discharge of one. *350 who, but for such discharge, would stand responsible as wep as himself, and ultimately to himself, presents so extraordinary a case, that if no powerful moral motive can ke discovered therefor, it must be set down to some other cause. But the morality of the case would,- most generally, be the other way. The endorser, for instance, knows that there was usury in the inception of the note, which he may prove or not, as he pleases. If he proves it, the maker of the note gets clear of the debt; and the money actually borrowed is forfeited to him, though equity says he ought to pay it; whilst on the'other hand, the innocent holder, induced to take the note as genuine, by seeing the name of the witness on it, or who has paid the witness himself the value, as for a valid note, loses all; (for most generally, these witnesses are not willing to testify against themselves, so long as they are solvent and have any thing to lose.) But it is said that the witness, when he passed the note to the holder, may have told him that it was usurious. Suppose he did. Did he tell him also, “ You must never look to the maker; for if you do, he will plead usury, and I will come in as a witness against you?5’ This would be so improbable a tale, and so directly the reverse of the ordinary transactions in such cases, that it would, of itself, discredit the witness.
All these things, however, I believe must go, according to the principles of the common law, to his credit, and not to his competence.
This case does not touch the question (a very important one) whether the maker oí a note can prove usury between himself and the holder, in a suit by him against one who has endorsed for the accommodation of the maker, so as to exonerate such endorser?
In such case, whilst, on the one hand, he might consider it more just that his innocent endorser should get clear of the whole debt, rather than that the oppressive usurer should receive it, yet, on the other hand, he may stand more exposed to objections arising from interest, than an *351 endorser. I merely mention this, to shew, that this case, and my opinion, extends only to the case of an endorser giving evidence.
I have taken this view of the question, as if it had arisen in the case of several actions on these notes and endorsements, or that the cognovit actionem has produced the same effect. But this is a joint action; and it remains to be decided, whether, with or without the cognovit, the witness could be examined.
The act of Assembly gives an action of debt, jointly or severally, for principal, interest and charges of protest; and the first question is, whether, if they are sued jointly, there can be a several judgment against each, according to their respective liabilities?
The notes were negotiable at Bank, and are put by the law, on the footing of foreign bills of exchange; but it is and must be admitted on all hands, that the liabilities of maker and endorsers are not by a joint, but by several contracts, and their responsibilities may therefore be different. Thus the notes, in their origin, may have been usurious and void as to the maker, and yet the first and subsequent endorser, liable to the holder. Again. The consideration between the last endorser and holder may have failed, or he may have paid part, so that the holder could not recover the whole against him; or, the first endorser may have paid part. Now if all or either of these things should appear on the trial, and be found in the verdict, what would be the judgment? A note, say, is given for $300. The maker proves that he paid $ 50; the first endorser, that he paid $100; and the last proves payment by him, of $100. Thus the holder has received all the money, except $50. Shall the verdict and judgment be only for this sum ? The act of Assembly could not, nor was it intended to change the nature of the liabilities of the parties, but only to give an additional remedj'. If they had been sued severally, on this note, the holder would recover against the maker $350; for he had paid no more *352 than $50, and could not avail himself of the payments ma(je by the others. So, he would recover against the first endorser $150; for he could not avail himself of the payment by the last endorser. Against him, he would recover $50; for that sum remains still due on the note, and for which all remain responsible to the holder. He remains the legal owner of the note; and if he enforces payment of the whole $350 from the maker, he takes $50 thereof on his own account, and holds, as trustee, $100 for each of the endorsers; and whatever he receives from the maker above the $50, if he docs not receive all, he will hold, first, for the last, and then, for the first endorser. If nothing is received from the maker, then, what he enforces from the first endorser goes, first, to pay the $50 due to himself, and the residue he takes in trust for the last endorser.
But how shall we render a judgment, according to these liabilities, in this joint action ? There would, in fact, be three sevei’al judgments, (as much so, as if there had been three several suits,) for several sums, with interest on each, and a fourth and joint judgment against all for the charges of protest and the costs, for which all would be jointly liable; and four executions would have to issue accordingly. I can devise no other mode of proceeding, to fit the case supposed, unless it would be to give a joint judgment against all, for whatever sum the maker shall not have paid, with a cesset executio as to the others, until it could be seen what could be enforced from him; and then to proceed against the first endorser for the balance, and finally against the last endorser, for any sum for which he was liable, and which has not been received from the others; with an immediate and joint execution against all, for the costs and charges of protest. But this delay might endanger the recovery from the endorsers, to the prejudice of the holder and of the last endorser.
Either course would seem to me more in the nature of a decree in Chancery, than like any common law judgment *353 I have ever seen. Wars il, the intention-of the Legislature, that the usual anti ordinary forms of proceeding and judgment, should be thus varied and broken in upon ? Tho contracts of the parties, though several, are nevertheless in relation to one bill or note, and of such nature, that it might, and most frequently does happen, that both maker and endorsers are liable to the holder, for precisely the same amount. A joint suit, in such case, would save costs and trouble.
Was it intended, that though such equal liability did not exist, that you may bring a joint suit, and afterwards, as the case may turn out, convert it, in fact, into several suits ? I think not. The action of debt is given, which is a new remedy, whether you sue jointly or severally; and a joint suit is also given, at the election of the party. If he doubts as to the equal liability of all, it seems to me, he ought to be confined to his several action, as in that way, neither his rights, nor those of others, will be put in danger; nor will any confusion be introduced into our forms of proceeding, the extent of which mischief, it is not easy to foresee.
But it is said the cognovit actionem by William Wood-ford, has severed the judgments; and that, as to him, the case must be considered as if the suits had been several; in which case, he might be a witness. This, I cannot admit, to the extent contended for. On the contrary, it seems to me, that in this joint suit, all are parties to the record, and must so continue until the final judgment, unless, indeed, we can liken it to a suit against joint trespassers, where the jury may retire and find one not guilty, there being no evidence as to him; so that judgment can he given for him, whatever may be the fate of the others; and in which case, he may be a witness. But there is no case, in which tho jury can retire and find one guilty of a trespass, and assess damages against him, so that judgment may be entered, and he then admitted as a witness. Nor could such defendant confess judgment for the whole damages claimed *354 by the declaration, without the assent of the plaintiff, ana j,e a witness; for he might be the principal offender, and though insolvent, the others would be liable to the damaSes against him, if assessed by the jury; which they would not be, when those damages were confessed. Here the party has not been discharged from the action, by a verdict in his favor; on the contrary, he confesses the action to the full amount; and although it is in an action on a contract, and where the plaintiff is not entitled to a judgment de melioribus damnis, yet it appears to me, that whether the judgment was entered on the cognovit or not, (especially if without the assent of the plaintiff,) it must be interlocutory in its nature, and not a judgment on confession within the act, until it is final. Indeed, it is admitted, that it is interlocutory as to the costs; otherwise the witness would be interested; for he would get clear of the costs of the trial, whether the plaintiff recovered against the other defendants or not. In the one case, there would be two judgments; the one, against him, limited, as to the costs, to those which had accrued at the time of the cognovit/ the other, also so limited as to him, and in which case, the plaintiff would lose the costs of the trial as to the others. Suppose, after this cognovit, and on the trial of the issues as to the other defendants, it had been found by the jury, not on the evidence of W. Woodford, but of some one else, that Taylor had paid to the plaintiff the whole of the money; would this cognovit put it out of the power of the Court, (the cause being still before them,) to set aside that judgment, and enter one in favor of all the defendants ? I think not; and that it would be error not to do so, on his motion, which error the previous cognovit would not release. In this respect, it seems to me, there was no more right to examine him as a witness, than if the case had stood on an office judgment against him, for want of a plea; and severance in pleading cannot vary the case.
But it is said, that whether there is a judgment irrevocable or not, or whether the pleas are joint or several, yet *355 the contracts are several; and inasmuch as, if there had been several suits, the parties could be witnesses for each other; and as their rights are not changed by the act; they must be received as witnesses, in the same manner as if there had been several suits; and judgment finally must be entered, according to their respective liabilities, as in such several suits.
It seems to me, that if this last proposition, viz. that there may be several judgments, cannot be maintained, there can be no ground whereon to rest the first; for if the testimony should vary the liabilities, and if the Court could not give judgment accordingly, but the judgment must be for the defendants, then the witness would be interested to produce this result.
As to there being several judgments in the ease, I must confess, notwithstanding what I have before said, that I feel much embarrassment on this point, and no little difficulty in relieving myself from this argument.
If the maker establishes the usury, this will not discharge the endorsers, who are still liable to the holder. How then is the judgment to be entered, if it is to be one in favor of all the defendants, so as to preserve the plaintiff’s rights as to the endorsers ? Is the maker to go quit entirely, as one defendant in trespass for whom there is a verdict; or is he still to remain liable to a several action, as in case of one defendant, who is sued on a joint contract, but who is discharged because a joint liability is not established, although each may be liable severally; as where A says to a merchant, let B. have goods, and if he does not pay, I will; here, though he could not be sued jointly with B. he may be ultimately responsible? The difficulty arises from the form in which the judgment is to be entered; for even as to the endorsers, as before said, they may be liable for different sums; and, if this appears, and there was a judgment for the maker against the plaintiff, and joint or several judgments for the plaintiff against the endorsers, as above stated, the maker would not receive his costs, which he *356 would, if there was a general judgment for the defendants. ]\jor can j at present see, how two several judgments can be entered for the defendants; one that the máker shall go entirely, because he has established the defence of usury; and one for the endorsers, because the plaintiff has failed to establish a joint demand against all, so as to enable him to go against all; for if there are to be two judgments, I do not see why we may not enter as many as the verdict may shew is necessary, and according to the liabilities of the parties. It seems to me, that the case cannot be put on the ground of one sued jointly with others, for a ■trespass, in which there may be a verdict and judgment for him for his costs, and afterwards one also, either for or against the other defendants; but that the only way to get out of the difficulty, will be, to consider the case as on a joint contract, in which the plaintiff has failed to prove a joint liability, and in consequence of which, the defendants go quit from that action, but may be liable to others in a different form.
The maker, for instance, has proved usury, or payment of part. One endorser has proved payment of part also. Another has not had notice, and so is entitled to a general verdict; and the consideration between the holder and last endorser, has failed; and all this is found by the verdict Are all these matters again to be tried, in several suits against these parties? I am not prepared to say, that a verdict, thus finding facts which go to the entire discharge of some of the defendants, may not avail them in bar of a several suit, in which the same matters shall be again put in issue; but yet I cannot see howT this can be, unless there is a judgment also in their favor, and in such a form as will constitute a bar; and which, it at present appears to me, in order to have that effect, must be a several judgment or judgments for them; for if such joint judgment is entered, as will be a bar as to them, it may possibly equally operate as a bar to the others, who ought to remain liable. The plaintiff may at all times relievo himself and *357 the Court from these difficulties, by suffering a non-suit, when he finds that he cannot establish a joint liability against all, for the same amount. But this he must do before the jury retire, according to the act of Assembly, and there may be doubts whether the several defences are made out, and he may think himself entitled to a verdict against all.
In case of a joint suit against several, as joint contractors, where the plaintiff fails in his proof of such contract, the jury may either find specially that he has so failed, and that therefore they find for the defendants; or may find generally for the defendants; and this will be no bar to actions in a different form. It therefore appears to me, considering the difficulties arising under this act, that when the matter is submitted to the jury, the safest course would be, not to find a general verdict for the defendants, unless a defence has been made out, which, on the merits, discharges all the defendants; but if any are liable and others not, or if liable, for unequal sums, to find the matter specially, and submit the judgment on the law to the Court, or to precede a general finding for the defendants, by a statement of the special matter, and that therefore they find for the defendants.
I therefore concur in the judgments that are to be entered.
Judge Cabell:
These are actions of debt, brought by James Beck, as endorsee of notes negotiable at one of the offices of the Farmers’ Bank of Virginia, against John Taylor, jr. as drawer, and John T. Woodford and William Woodford, as endorsers thereof. William Woodford having, in due form of law, acknowledged the plaintiff’s action, was, on the trial of the causes as to the other defendants, offered by them as a witness in their behalf: and the question is, whether, under such circumstances, he was, to any purpose, a *358 competent witness. This question involves another, of a more general nature; whether a person who is a party to a negotiable paper shall be permitted under any circumsanees to invalidate it by his own testimony. In England, the case of Jordaine v. Lashbrook, 7 Term Rep. 601, decidedly settled this question in the affirmative; and their subsequent practice has invariably conformed to that docisión. The Courts of some of the United States, have come to a different conclusion; and the question is now, for the first time, presented to this Court. So much has been said on both sides of this question, in England, and in the United States, that I find myself unable to advance any new idea on the subject; nor could I amend, by repetition, what has been said by others. I shall, therefore, content myself with declaring my firm conviction of the propriety of the decision in Jordaine v. Lashbrook.
But the question, properly belonging to these cases, still recurs; was William Woodford, a competent witness for his co-defendants, in joint action brought against him and them under our act of Assembly.
By the charter of the Farmers’ Bank of Virginia, all notes or bills negotiable at the said Bank, or any of its offices of discount and deposit, are “placed on the same footing as foreign bills of exchange, so that the like remedy may be had for the recovery thereof, against the drawer or drawers, endorser or endorsers, and with the like effect, except so far as relates to damages.” 2 Rev. Code, pa. 90. To determine what that remedy is, and the effect thereof, we are carried back to the Old Revised Code, ch. 77, § 3, which declares that “it shall be lawful for any person or persons having a right to demand any sum of money upon a protested bill of exchange, to commence and prosecute an action of debt, for principal, damages, interest and charges of protest, against the drawers or endorsers jointly, or against either of them separately; and judgment shall and may be given for such principal, damages and charges.” This act, in giving a joint action against *359 several persons, on several contracts, gives a remedy novel and unknown to the common law. It is important to ascertain whether, although the action be joint, the Legislature intended to authorise several judgments; or a joint judgment, as in case of a joint and entire contract. This act was made rather for the benefit of the plaintiffs, than of the defendants; for it is at the option of the plaintiffs, to make the action joint, or to bring several actions, as before the statute: And having been instituted for their benefit, I felt strongly disposed to give it a construction advancing that object, by allowing the plaintiffs to recover as to such of the defendants against whom they might establish their case, although there might be a failure to establish it as to some of them. But I cannot give it that construction without violaiing what appears to be the obvious meaning of the Legislature, and without doing the most manifest injustice to the acquitted defendants. It is worthy of remark, that, on common law principles, the proper demand of the holder of a bill of exchange, (by which I mean that demand which he makes for his own benefit,) although not a joint one against the drawer, acceptor and endorser, is, nevertheless, the same against all and each of them. Each is liable for principal, interest, damages and charges of protest. Each is liable for the same sum of money. It is fair to presume, even from the phraseology of the law above referred to, that the Legislature had this in mind, and intended to provide a joint remedy against all those whose liabilities, before the act, although several, were the same. It is obvious, that the Legislature did not look to a case where some of the defendants are liable for the full amount of the plaintiff’s demaud, and others are liable to no part of it. If they had looked to this last mentioned ease, they would have taken care to do justice to the acquitted defendants, by giving them their costs. This could not be done by the previous provisions in our Code, as to costs; and as it was not provided for by the act under discussion, we cannot suppose that the *360 Legislature intended more than to give a joint action, sub» jec(- all the consequences of a joint, action at the eommon law, on a contract joint and entire. One of these consequences is, that the judgment also, must be joint; and that a failure as to one of the defendants, is a failure as to all of them. The exceptions to this rule, as to infants, bankrupts, and executors, were strongly relied upon by the appellants. But this case cannot be assimilated to them. In the exceptions to the rule, thus relied upon, there was nothing to shew that the plaintiff’s cause of action, as laid in his declaration, never existed as to some of the defendants. But a drawer of a bill of exchange, who shews that the bill was given for a gaming, or usurious consideration, or an endorser who has not received notice of the dishonor of the bill, shews that he never was liable to the plaintiff’s action. And it would be monstrous to give the plaintiff the power, by joining him in the suit, to subject him to costs.
If W. Woodford, therefore, had not confessed the plain» tiff’s action, he could not have been a competent witness for the other defendants, since he could have said nothing for them, which would not have enured to his own benefit.
His confession did not, in my opinion, change the case. No final judgment cpuld regularly be entered on that confession, till the issues, as to the other defendants, were disposed of; nor could any final judgment be entered even then, but in conformity with the finding upon those issues. Notwithstanding his confession, the judgment even as to him, must await and be dependent upon the verdict as to the other defendants. The judgment as to him, and as to them, must be the same; it must be joint. If judgment be for them, it must be for him also, notwithstanding his confession.
Our act of Assembly, making a judgment on confession, equal to a release of errors, has no effect in this case. The confession releases errors antecedent thereto; but does not justify subsequent irregularities by the Court.
*361 The result is, that the judgment in the second suit, (where the judgment, on the cognovit actionem awaited the final decision of the cause) is to be affirmed. In the other case, (where final judgment was entered against W. Woodford on his cognovit actionem,) the judgment is to be reversed, and a joint judgment entered up against all the defendants. And, even in this case, the appellee is to recover his costs, as the party substantially prevailing.